TRINETTE G. KENT (State Bar No. 222020)
3219 E Camelback Rd #588
Phoenix, AZ 85018
Telephone: (480) 247-9644
Facsimile: (480) 717-4781
E-mail: tkent@lemberglaw.com

Of Counsel to
Lemberg Law, LLC
A Connecticut Law Firm
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile: (203) 653-3424

Attorneys for Plaintiff,
John McBride

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| John McBride, | Case No.: 2:16-cv-02390-TLN-CKD |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| Rash Curtis & Associates, | |
| Defendant. | Hearing Date: May 31, 2018<br>Time: 2:00 p.m.<br>Judge: Troy L. Nunley |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

STATEMENT OF THE FACTS ......................................................................................... 1

ARGUMENT ..................................................................................................................... 5

I.     LEGAL STANDARD ........................................................................................ 5

II.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE TCPA CLAIMS ........................................................................ 6

   A.  Predictive Dialer's are ATDS ................................................................... 6

   B.  Global Connect is a Predictive Dialer ATDS ........................................ 10

   C.  Defendant Lacked Prior Express Consent to Call Plaintiff .................... 11

     i.  *Defendant Never Had Prior Express Consent* ............................... 11

        1.  The Facesheets do not constitute prior express consent ...................... 11

        2.  Plaintiff did not provide prior express consent ..................... 14

        3.  The Patient Notes do not provide prior express consent....................... 15

     ii.  *Even If It Existed, Consent Could Be Revoked*.............................. 16

   D.  The Calls Placed after Revocation Constitute Knowing and Willful Violations of the TCPA ........................................................................ 18

III.   DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE FDCPA CLAIMS .................................................................. 18

IV.   DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE ROSENTHAL ACT CLAIMS ................................................ 21

   A.  Plaintiff has Standing ............................................................................. 21

   B.  Defendant Violated Cal. Civ. Code § 1788.11(d) and (e) ..................... 22

   C.  Defendant Violated Cal. Civ. Code § 1788.17 ...................................... 22

V.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING ACTUAL DAMAGES ................................................................. 23

CONCLUSION ............................................................................................................... 23

# **TABLE OF AUTHORITIES**

**Cases**

*ACA Int'l v. Fed. Commc'ns Comm'n,*
  885 F.3d 687 (D.C. Cir. 2018)...................................................................6, 8, 9, 10, 16

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ...................................................................................................5

*Arteaga v. Asset Acceptance, LLC,*
  733 F. Supp. 2d 1218 (E.D. Cal. 2010) ....................................................................19

*Baird v. Sabre, Inc.,*
  636 F. App'x 715 (9th Cir. 2016) .............................................................................10

*Carman v. CBE Grp., Inc.,*
  782 F. Supp. 2d 1223 (D. Kan. 2011) .......................................................................20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ...................................................................................................23

*Chavious v. CBE Grp., Inc.,*
  No. 10-CV-1293 JS ARL, 2012 WL 113509 (E.D.N.Y. Jan. 13, 2012)....................20

*Crockett v. Rash Curtis & Assocs.,*
  929 F. Supp. 2d 1030 (N.D. Cal. 2013).................................................................19, 22

*Gonzales v. Arrow Fin. Servs., LLC,*
  660 F.3d 1055 (9th Cir. 2011) ...................................................................................22

*Gouskos v. Aptos Vill. Garage, Inc.,*
  94 Cal. App. 4th 754 (2001) ......................................................................................21

*Hernandez v. Rash Curtis & Associates,*
  No. 2:16-cv-02455-GHW (E.D. Cal. Nov. 16, 2017) ..........................................10, 18

*Iniguez v. The CBE Grp.,*
  969 F. Supp. 2d 1241 (E.D. Cal. 2013) .....................................................................11

*Jiminez v. Accounts Receivable Mgmt., Inc.,*
  No. CV 09-9070-GWAJWX, 2010 WL 5829206 (C.D. Cal. Nov. 15, 2010) ...............20

*Jones v. Rash Curtis & Assocs.,*
  No. C 10-00225 JSW, 2011 WL 2050195 (N.D. Cal. Jan. 3, 2011).........................20

ii

*Joseph v. J.J. Mac Intyre Companies, L.L.C.*,
    238 F. Supp. 2d 1158 (N.D. Cal. 2002)..................................................19

*King v. Time Warner Cable*,
    113 F. Supp. 3d 718 (S.D.N.Y. 2015) .................................................18

*Lathrop v. Uber Techs., Inc.*,
    No. 14-CV-05678-JST, 2016 WL 97511 (N.D. Cal. Jan. 8, 2016)....................13

*Los Angeles Lakers, Inc. v. Fed. Ins. Co.*,
    No. 15-55777, 2017 WL 3613340 (9th Cir. Aug. 23, 2017)............................6

*Lynch v. Nelson Watson & Assocs., LLC*,
    2011 WL 2472588 (D. Kan. June 21, 2011) ..........................................20

*Mais v. Gulf Coast Collection Bureau, Inc.*,
    768 F.3d 1110 (11th Cir. 2014) ......................................................13

*McMillion v. Rash Curtis & Assocs.*,
    No. 16-CV-03396-YGR, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018) ...............10

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) .........................................................6

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012) ...................................................................6

*Nigro v. Mercantile Adjustment Bureau, LLC*,
    769 F.3d 804 (2d Cir. 2014) .........................................................15

*Reyes v. BCA Fin. Servs., Inc.*,
    2018 WL 2220417 (S.D. Fla. May 14, 2018).....................................7, 8, 9

*Sanchez v. Client Servs., Inc.*,
    520 F. Supp. 2d 1149 (N.D. Cal. 2007)..............................................19

*Stirling v. Genpact Servs., LLC*,
    No. 2:11-CV-06369-JHN, 2012 WL 952310 (C.D. Cal. Mar. 19, 2012)................19

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014) ...............................................................5

*Tucker v. CBE Grp., Inc.*,
    710 F. Supp. 2d 1301 (M.D. Fla. 2010) .............................................20

*U.S. W. Commc'ns, Inc. v. Jennings*,
    304 F.3d 950 (9th Cir.  2002) .......................................................10

iii

*United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*,
835 F.3d 1159 (9th Cir. 2016) .............................................................................................5

*Vaccaro v. CVS Pharmacy, Inc.*,
No. 13-CV-174-IEG RBB, 2013 WL 3776927 (S.D. Cal. July 16, 2013) .....................11

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) .............................................................................................6

*Waite v. Fin. Recovery Servs., Inc.*,
No. 8:09-CV-02336, 2010 WL 5209350 (M.D. Fla. Dec. 16, 2010) .............................20

*Zetwick v. Cty. of Yolo*,
850 F.3d 436 (9th Cir. 2017) .............................................................................................5

**Statutes**

15 U.S.C. § 1692d .....................................................................................................19, 22

47 U.S.C. § 227 ...............................................................................................6, 8, 11, 18

Cal. Civ. Code § 1788.11 ...................................................................................................22

Cal. Civ. Code § 1788.17 .....................................................................................................2

Cal. Civ. Code § 1788.32 ...................................................................................................22

**Other Authorities**

Fed. R. Civ. P. 56(a) .............................................................................................................5

**Rules**

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
18 FCC Rcd. 1,014 (2003) ...................................................................................................7

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
23 FCC Rcd. 559 (2008) .......................................................................................................7

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
27 FCC Rcd. 15391 (2012) ...................................................................................................8

Plaintiff, John McBride (hereafter "Plaintiff"), by undersigned counsel, respectfully opposes Defendant Rash Curtis Associate's ("Defendant") Motion for Summary Judgment or Partial Summary Judgment. (Doc. No. 12).

## STATEMENT OF THE FACTS

### *The 9189 Number*

The relevant, undisputed facts are as follows. The 9189 Number is solely Plaintiff's cellular telephone number. (McBride Decl. ¶¶ 3-4). He is the only person who uses that number, it is his only cell phone number, and it has been his number for more than five (5) years. *Id.*

### *The "Facesheets"*

On May 14, 2013, August 8, 2013 and February 10, 2014, *non-party* Marianne McBride ("Marianne"), Plaintiff's wife, filled out three "Facesheets" in connection with her request for medical services from Rideout Health. (the "Facesheets").[1] The Facesheets each contained separate fields for the patient (Marianne) to enter her home phone and cell phone numbers. *Id.* Marianne did not list Plaintiff's cellular telephone number (the 9189 Number) as her "home phone" or "cell phone" on *any* of the Facesheets Defendant submits. *Id.* Instead, she listed different telephone numbers. *Id.*

The Facesheets separately included a space for Marianne to list an "emergency contact" with the emergency contact's address, "home phone" and "cell phone." *Id.* Marianne identified Plaintiff as her "emergency contact" and listed the 9189 Number as *his* cell phone on the Facesheets. *Id.*

*None* of the Facesheets, nor the Conditions of Admission that Defendant submits, either (1) permit Rideout Health's release of the patient's emergency contact information to any other entities, including debt collectors or (2) permit any other entity, aside from Rideout Health, to contact the emergency contact for any reason (financial, debt collection or otherwise). (Def. Exhibit 3).

---

[1] Defendant submitted copies of the Facesheets as Exhibit 3 to its Motion for Summary Judgment. (Doc. No. 12-5 at RASH CURTIS 00063, 00066 and 00071).

Thereafter, Rideout transferred a number of Marianne's accounts to Defendant for collection. (Keith Decl. [2] ¶ 10). Defendant obtained the Facesheets from Rideout Health, which were "related to Marianne McBride's visits . . . ." *Id.* at ¶ 7-8.

### Defendant's Calls to the 9189 Number

Beginning on August 14, 2014, Defendant began placing debt collection telephone calls to Plaintiff's cellular telephone, the 9189 Number, regarding Marianne's debt. (Keith Decl. ¶¶ 18-19; Def. Exhibit 4 ("Collection Notes")[3]). In total, Defendant placed forty-five (45) calls to the 9189 Number between August 14, 2014 and February 18, 2016 "in connection with Marianne's various debts." (Keith Decl. ¶ 19).

Two of those calls were placed manually; forty-three (43) were made with Rash Curtis's Global Connect dialer. (Def.'s Response to Interrogatory No. 7[4] ("When a call is initiated via Global Connect, the date of the call is preceded by the letters 'GC'"); Collection Notes; Keith Decl. ¶ 23 (specifying two calls were manually placed) & ¶ 26 ("Other than the calls which Rash Curtis manually dialed, all other calls to the 9189 number during the relevant time period were placed using 'Global Connect.'")).

### Plaintiff Says Stop on August 13, 2015

Defendant's Collection Notes indicate that it had a conversation with Plaintiff and his wife on August 13, 2015. (Collection Notes at RASH CURTUS 00012 ("MRS & MR . . . SD THT THY PAID EVERYTHING SD THY DNT OWE NOTHING WLLSEND THEM LTTER."). During this call, Plaintiff told Defendant to stop calling the 9189 Number. (McBride Decl. ¶ 6 ("stop calling the 9189 Number").

---

[2] Defendant submitted the Declaration of Robert Keith in support of its Motion for Summary Judgment. (Doc. No. 12-4).

[3] Defendant submitted a copy of its Collection Notes as Exhibit 4 to its Motion for Summary Judgment. (Doc. No. 12-5 at RASH CURTIS 0004-00013).

[4] A copy of Defendant's Responses to Plaintiff's First Set of Interrogatories are attached to the Kent Decl. as Exhibit A.

Nonetheless, between August 13, 2015 and October 19, 2015, Defendant placed ten (10) subsequent calls to Plaintiff with its Global Connect dialer. (Collection Notes at RASH CURTIS 00012-13).

### *Plaintiff Says Stop Again on October 19, 2015*

The Collection Notes further indicate that on October 19, 2015, Plaintiff advised Defendant that it was calling *his* cellular telephone and not his wife's. (Collection Notes at RASH CURTIS 00013 ("MR SD THIS IS HIS #")). During this call, Plaintiff reiterated his request for Defendant to cease calling him. (McBride Decl. ¶ 7).

After October 19, 2015, Defendant placed seven (7) subsequent calls to the 9189 Number with its Global Connect dialer. (Collection Notes at RASH CURTIS 00013; Keith Decl. ¶ 24).

### *Plaintiff's Attorney Says Stop but the Calls Continue*

On February 1, 2016, Plaintiff's counsel mailed a letter to Rash Curtis stating that she represents Plaintiff and directing Rash Curtis to "cease all calls to [the 9189 Number]." (Kent Decl. ¶ 5; Kent. Decl. Exhibit D). The letter was delivered to Rash Curtis on February 5, 2016 at 10:52 a.m. (Kent Decl. ¶ 6; Kent Decl. Exhibit E). On February 9, 2016, counsel for Defendant confirmed receipt of the letter; she emailed that she "had been retained by Rash Curtis & Associates to respond to your letter dated February 1, 2016 sent on behalf of John McBride." (Kent Decl. ¶ 7; Kent Decl. Exhibit F).

Despite receiving the letter on February 5, 2016, Rash Curtis called the 9189 Number with its Global Connect dialer three (3) more times; on February 8, 2016, February 17, 2016 and February 18, 2016. (Collection Notes at RASH CURTIS 00013).[5]

---

[5] On March 10, 2016, more than a month after it had retained counsel, Rash Curtis updated its Collection Notes to reflect that "THIS ACCOUNT IS NOW WITH ATTY AMANADA [sic] WITH HER HUSBANDS." (Collection Notes at RASH CURTIS 00013). This casts serious doubt on Robert Keith's declaration that Rash Curtis employees "are trained to accurately reflect the events and conversations with debtors and record them contemporaneously in Rash Curtis' collection notes" and in particular, cease requests. (Keith Decl. ¶ 5).

3

*The Global Connect Dialer is a Predictive Dialer*

Defendant admits that the Global Connect dialer, which was used to place the above calls, is a "predictive dialing system," (Keith Decl. ¶ 24; *see also* Doc. No. 12-1 at 2 ("the predictive dialing technology used by Rach Curtis here")), that "dial[s] numbers from a list which Rash Curtis loads into the dialer." (Keith Decl. ¶ 26). Beyond the loading of lists into the dialer (*Id.*) there is no evidence of any human intervention in making dialer calls with the Global Connect dialer.

The Global Connect dialer also uses prerecorded voices and/or messages. Defendant concedes that "Plaintiff might hear a prerecorded and/or artificial voice upon answering the call, or [a] prerecorded and/or artificial voice might have been left on Plaintiff's voicemail and/or answering machine where the collection notes indicate 'PHONE ANSWER NO LINKBACK' or 'LMOM'." (Def. Response to Interrogatory No. 8). "'LMOM' means left message on machine." (Def. Response to Interrogatory No. 23). The Collection Notes contain nineteen (19) separate instances where Defendant called the 9189 Number with its Global Connect dialer and notated "PHONE ANSWERD NO LINKBANK," (Collection Notes at RASH CURTIS 00009-00013). The Collection Notes additionally contain four (4) separate instances where the Defendant called the 9189 Number with its Global Connect dialer and notated "LEFT MSGE ON MACHINE." (Collection Notes at RASH CURTIS 00009-00013).

The user manual associated with Defendant's Global Connect dialer confirms that it is a predictive dialer that can dial telephone numbers without human intervention, and can broadcast prerecorded and artificial messages. It describes the Global Connect as a cloud-based telephone dialer system which "broadcasts" prerecorded or artificial messages to telephone numbers. (Global Connect User Manual (Kent Decl., Exhibit C)[6] at RASHCURTIS0018, 00030, 00042, 00045, 00058,

---

[6] In its response to Request for Production No. 5, Defendant responded that "Defendant will produce Global Connect's user manual. Please see exhibit C 'Global Connect User Manual." (Kent Decl. ¶¶ 5-6; Kent Decl. Exhibit B). However, the user manual is 77 pages but Defendant only produced 6 of those pages. (*See* Kent Decl., Exhibit B at RASH CURTIS 00017 – 00023.) In another recent TCPA lawsuit, *Hernandez v. Rash Curtis & Associates,* No. 2:16-cv-02455-GHW (E.D. Cal.), Defendant likewise produced a copy of the Global Connect user manual, but produced that manual in its entirety, a copy of which is available in that case's public docket at ECF No. 26-6, and attached to

00047, 00051, 00054, 00068-70).  Global Connect requires users to "upload, creat[e], and stor[e]" "call lists" and "recorded messages" and then schedule, ahead of time, when Global Connect should broadcast those recorded messages to telephone numbers contained in the call list or to otherwise just dial. (*Id.* at RASHCURTIS0009).

## **ARGUMENT**

### I. **LEGAL STANDARD**

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).  "[S]ubstantive law will identify which facts are material" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  "This . . . is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).  Moreover, the court "must recognize that, where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal citations and quotation marks omitted).  "In short, what is required to defeat summary judgment is simply evidence such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (internal citations and quotation marks omitted).

---

the Declaration of Trinette G. Kent as <u>Exhibit C</u>. (Kent Decl. ¶ 4; Kent. Decl. <u>Exhibit C</u>).  Plaintiff relies on and cites to the full user manual attached as <u>Exhibit C</u>.

## II. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE TCPA CLAIMS

Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). It "establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). The TCPA prohibits any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service. . . ." 47 U.S.C. § 227(b)(1)(A)(iii). The elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system or a prerecorded or artificial message; (3) without the recipient's prior express consent." *See Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, No. 15-55777, 2017 WL 3613340, at *6 (9th Cir. Aug. 23, 2017) (citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)); 47 U.S.C. § 227(b)(1)(A)(iii). Moreover, "[e]xpress consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof." *Van Patten*, 847 F.3d at 1044.

### A. Predictive Dialer's are ATDS

Defendant argues that its "predictive dialer," (Keith Decl. ¶ 24), which "load[s] numbers off a specific list of debtors," is not an ATDS because the dialer purportedly "had no present ability to generate (that is, 'create') random or sequential numbers." (Doc. No. 12-1 at 1-2). Defendant relies entirely on the D.C. Circuit's recent decision in *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018) ("*ACA International*"). Defendant contends *ACA International* "vacated the FCC's previous order [*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C. Rcd. 7961 (July 10, 2015) ("2015 FCC Ruling")], which had found that a predictive dialing telephone system constituted an 'ATDS' within the meaning of the TCPA." (Doc. No. 12-1 at 1). According to Defendant, "[t]he D.C. Circuit ruled that an 'ATDS' must have the ability to generate (that is, 'create') random or sequential numbers and dial those

numbers," *id.,* and under *ACA International* its self-described "predictive dialing system" (Keith Decl. ¶ 24) is no longer an ATDS.

However, *ACA International* ruled no such thing and Defendant has completely misread its holding; predictive dialers are ATDS under FCC orders and rulings from 2003, 2008 & 2012 and such determinations were not overturned or changed by *ACA International. Reyes v. BCA Fin. Servs., Inc.*, 2018 WL 2220417, at *11-13 (S.D. Fla. May 14, 2018) ("[T]he Court finds that the prior FCC Orders are still binding. Therefore, the ACA International case does not change the Court's conclusion on the ATDS issue." & "In sum, the Court grants summary judgment in Reyes' favor on the ATDS issue, finding that the Noble predictive dialer, as used by BCA Financial, was an ATDS as a matter of law.").

In 2003 the FCC found "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd. 1,014, 14093 (2003). As the FCC explained:

> The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. The principal feature of predictive dialing software is a timing function, not number storage or generation.

*Id.* at 14091 (internal citations omitted).

In 2008, the FCC issued a declaratory judgment that "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008). In 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially

generated or come from calling lists." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15399 (2012).

In 2015, the FCC issued the 2015 FCC Ruling which also addressed the ATDS issue and which was appealed in *ACA International*. The D.C. Circuit, in reviewing the FCC 2015 treatment of ATDS, identified two questions which arise from the TCPA's definition of ATDS[7]: "(i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" *ACA International*, 885 F.3d at 695.

On the first question, the 2015 FCC Ruling answered with a formulation of capacity which included its "'potential functionalities' or 'future possibility,' not just its 'present ability.'" The D.C. Circuit set aside this treatment. While the D.C. Circuit found that "capacity" necessarily includes some future functioning state and not present ability (*Id.* at 696 ("Virtually any understanding of 'capacity' thus contemplates some future functioning state, along with some modifying act to bring that state about."), the 2015 formulation had no reasoned limit and had "the apparent effect of embracing any and all smartphones" as they *could* download an app to enable autodialing even if no such download was made. *Id.* Because of this reach, the 2015 FCC Ruling's definition of capacity was "untenable." *Id.* at 689; *see Reyes*, 2018 WL 2220417 at *8.

On the second question (the functions), the D.C. Circuit found that the 2015 FCC Ruling's answer was at cross purposes with itself. The *Reyes* Court:

> After its review, the D.C. Circuit concluded that the 2015 FCC order "falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *Id.* For instance, on the question of "whether a device must itself have the ability to generate random or sequential telephone numbers to be dialed" or can simply "call from a database of telephone numbers generated elsewhere," the FCC was "of two minds on the issue." *Id.* at 701.
>
> Specifically, the D.C. Circuit explained that "[w]hile the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a

---

[7] "The term 'automatic telephone dialing system' means equipment which has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

8

competing view: that equipment can meet the statutory definition even if it lacks that capacity." *Id.* at 702. On that issue, the FCC reaffirmed its 2003 order, in which it had "made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *Id.* at 702.

The D.C. Circuit did not reject one view or the other. Rather, it recognized that *either* interpretation might be permissible but disapproved the FCC's Janus-like approach.

*Reyes*, 2018 WL 2220417 at *9.

It was that conflicting stance in the 2015 Ruling which made *it*, that specific ruling, fail to satisfy reasoned decision making. But *ACA International* did not reach back and say that prior orders suffered the same defect. Again, the *Reyes* Court:

[W]hat *ACA International* did was to reject the FCC's have-your-cake-and-eat-it-too approach to the questions before it. The FCC was of "two minds on the issue" of whether "a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer," or whether "that equipment can meet the statutory definition even if it lacks that capacity." *Id.* at 701–02. The FCC answered "yes" and "yes," i.e., it *must have* that ability and it *may lack* that ability, two conflicting answers that the D.C. Circuit could not accept because it provided no meaningful guidance.

But what *ACA International* did not do is endorse one interpretation over the other, even implicitly. *ACA International* did not say that a predictive dialer, or any other type of device, must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer. Nor did it say that a predictive dialer, or any other type of device, may lack that capacity. In fact, the D.C. Circuit said that "[i]t might be permissible for the Commission to adopt either interpretation." *ACA Int'l*, 885 F.3d at 703 (emphasis added). But what the FCC could not do was "espouse both competing interpretations in the same order." *Id.*

*Id*. at *12.

Here, as in *Reyes*, Defendant is "essentially urging the Court to adopt the first interpretation—i.e., that a predictive dialer must be able to generate and dial random or sequential numbers to be an ATDS—based on *ACA International's* authority. But *ACA International* does not compel that conclusion because it did not adopt that interpretation." *Id*. Indeed, *ACA International* did not adopt any interpretation of the required capacities.

This Court cannot do as Defendant asks. Under the Hobbs Act, "properly promulgated FCC regulations currently in effect must be presumed valid." *U.S. W. Commc'ns, Inc. v. Jennings,* 304 F.3d 950, 958 n. 2 (9th Cir. 2002); *Baird v. Sabre, Inc.*, 636 F. App'x 715, 716 (9th Cir. 2016). While the 2015 Ruling was set aside, the 2003 FCC Order was not. Indeed, while the 2015 Ruling failed because it identified conflicting functions, "in the 2003 order, the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS." *ACA International*, 885 F.3d at 702. That 2003 Order is a properly promulgated FCC regulation, was not struck by *ACA International* and is binding under the Hobbs Act.

## B. Global Connect is a Predictive Dialer ATDS

It is undisputed that Defendant's Global Connect is a predictive dialer. Defendant's Vice President admits it is "predictive dialing system," (Keith Decl. ¶ 24; *see also* Doc. No. 12-1 at 2 ("the predictive dialing technology used by Rach Curtis here")), that "dial[s] numbers from a list which Rash Curtis loads into the dialer." (Keith Decl. ¶ 26). Beyond the loading of lists into the dialer, there is no evidence of any human intervention in making dialer calls with the Global Connect dialer. Just three months ago, in a class action TCPA lawsuit against Rash Curtis in the Northern District of California, Rash Curtis's Global Connect dialer was found to be an ATDS as a matter of law. *See McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2018 WL 692105, at *5 (N.D. Cal. Feb. 2, 2018) ("the Court holds that Rash Curtis' Dialers constitute ATDSs within the meaning of the TCPA."); *see also Hernandez v. Rash Curtis & Associates,* No. 2:16-cv-02455-GHW (E.D. Cal. Nov. 16, 2017) (ECF No. 35) (entering summary judgment against Rash Curtis and in the plaintiff's favor regarding plaintiff's TCPA claim for treble damages; in that case, as here, Rash Curtis used the same Global Connect dialer.). Thus, Defendant's request for summary judgment on the ATDS issue is without merit.

Further, Defendant's records show that on twenty-three (23) separate instances, Defendant placed calls to 9189 Number in which, Defendant admits, "Plaintiff might hear a prerecorded and/or artificial voice upon answering the call, or prerecorded and/or artificial voice might have been left on

Plaintiff's voicemail and/or answering machine . . . ." (Def. Response to Interrogatory Nos. 8 & 23; Collection Notes at RASH CURTIS 00009-00013)). For each of those calls, whether or not Defendant's dialer qualifies as an ATDS is irrelevant, because Plaintiff need only prove that Defendant used an artificial or prerecorded voice *or* an ATDS, not both. *See Iniguez v. The CBE Grp.*, 969 F. Supp. 2d 1241, 1247 (E.D. Cal. 2013) ("Plaintiff's complaint alleges both that Defendant used an automatic telephone dialing system and that Defendant's system utilized an artificial voice. . . . Either allegation is sufficient on its own to support Plaintiff's claims."); *Vaccaro v. CVS Pharmacy, Inc.*, No. 13-CV-174-IEG RBB, 2013 WL 3776927, at *3 (S.D. Cal. July 16, 2013) ("Alleging the use of either an ATDS or an artificial or prerecorded voice would suffice; here, Plaintiff adequately pleads both.").

### C. Defendant Lacked Prior Express Consent to Call Plaintiff

Defendant moves for summary judgment on its affirmative defense of prior express consent to TCPA liability. It argues that it had prior express consent to place automated debt collection calls to Plaintiff regarding another individual's debt, via (1) the Facesheets his wife filled out listing him as a medical emergency contact; (2) during a telephone conversation between Plaintiff and Rash Curtis; and (3) pursuant to certain "patient notes" associated with Marianne McBride. None of these materials and communications provided Rash Curtis with prior express consent to place repeated automated debt collection calls to Plaintiff's cellular telephone regarding someone else's debt.

Moreover, notwithstanding the fact that Rash Curtis never had consent to place automated calls to Plaintiff's cellular telephone, Plaintiff asked Rash Curtis, on three separate occasions, for it to stop calling his cellular telephone, effectively revoking any consent that might have existed. Nonetheless, Rash Curtis continued to call Plaintiff.

#### i. Defendant Never Had Prior Express Consent

##### 1. The Facesheets do not constitute prior express consent

Defendant must have "prior express consent *of the called party*" in order to avoid TCPA liability for its automated telephone calls to a cellular telephone. 47 U.S.C. § 227(b)(1)(A) (emphasis added).

11

Defendant asserts it obtained prior express consent from the Facesheets, which Marianne, not Plaintiff, filled out. (Doc. No. 12-1 at 2-3). As discussed above, the Facesheets each contained separate fields for the patient, i.e., Marianne, to enter to enter her home phone and cell phone numbers. *Id.* Marianne did not list Plaintiff's cellular telephone number (the 9189 Number) as her "home phone" or "cell phone" on *any* of the Facesheets Defendant submits. *Id.* Instead, she listed different telephone numbers. *Id.* The Facesheets separately included a space for Marianne to list an "emergency contact" as well as the emergency contact's "home phone" and "cell phone." *Id.* Marianne identified Plaintiff as her "emergency contact" and listed the 9189 Number as *his* cell phone on the Facesheets. *Id.*

Notably, *none* of the Facesheets, nor the Conditions of Admission that Defendant submits, either (1) permit Rideout Health's release of the patient's emergency contact information to any other entities, including debt collectors or (2) permit any other entity, aside from Rideout Health, to contact the emergency contact for any reason (financial, debt collection or otherwise). (Def. Exhibit 3).

Nonetheless, Rash Curtis states that "Plaintiff's wife provided the 9189 number to Rideout in connection with her medical treatment" and thus gave prior express consent. (Doc. No. 12-1 at 2). But Rash Curtis fails to note that Plaintiff and his telephone number were listed for the discrete purpose of providing an *emergency* contact, not as an individual to call regarding debt collection years later, and nothing on the Facesheets permits either Rideout or Rash Curtis to call an emergency contact for financial or debt collection purposes. Notably, in other cases Rash Curtis has already attempted – and failed – to argue that a third party's provision of the plaintiff's number to a hospital regarding the third-party's debt, constituted prior express consent to call the plaintiff. *See McMillion*, 2018 WL 692105, at *8 (holding Rash Curtis lacked prior express consent to call plaintiff where it was "undisputed that defendant did not call [plaintiff] 'in connection with a particular debt' owned by [plaintiff]. Rather, the calls were in connection with a debt apparently owed by non-party Reynoso." In so holding, court rejected Rash Curtis's argument that a non-party's voluntarily

provision of plaintiff's cell phone to a hospital constituted prior express consent to call that number "regardless of the account holder.").

Nor does the evidence support Rash Curtis's contention that the 9189 Number is a "shared" number, rather than Plaintiff's number. In fact, the 9189 Number is solely Plaintiff's cellular telephone number; he is "the only person who uses the 9189 Number, and it is [his] only cellular telephone number." (McBride Decl. ¶¶ 3-4). In addition, Plaintiff's wife provided a *separate* number for herself on the Facesheets, which was not the 9189 Number. (Facesheets). Rash Curtis cites to a bill from Verizon showing that Plaintiff and his wife participate in a family cellular telephone plan in which they share minutes and data, and listing Plaintiff's wife's name under the 9189 Number and Plaintiff's name under a different number. (Doc. No. 12-1 at 2; Def. Exhibit 7). However, the FCC has "concluded that the term 'called party' should be defined as 'the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, *or the non-subscriber customary user of a telephone number included in a family or business calling plan.'" Lathrop v. Uber Techs., Inc.*, No. 14-CV-05678-JST, 2016 WL 97511, at *2 (N.D. Cal. Jan. 8, 2016) (citing 2015 FCC Order at ¶ 73) (emphasis added). Thus, as the customary user of the telephone number, Plaintiff is the "called party" for purposes of prior express consent under the TCPA, and Rash Curtis needed *his* consent, not someone else's.

In addition, Defendant's reliance on *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014), is misplaced. In that case, the plaintiff underwent emergency room treatment at a hospital, and his wife, *on behalf of* the plaintiff, "completed and signed admissions documents, which she gave to a Hospital representative" and "expressly agreed that 'the hospital and the physicians or other health professionals involved in the inpatient or outpatient care [may] release [Plaintiff's] healthcare information for purposes of treatment, *payment* or healthcare operations,' including 'to any person or entity liable for payment on the patient's behalf in order to *verify coverage or payment questions, or for any other purpose related to benefit payment.'" Mais*, 768 F.3d at 1113–14 (emphasis added). The hospital thereafter transferred an unpaid medical bill arising out of the plaintiff's treatment, to a third-party debt collector, which then called the plaintiff's

cellular telephone to collect the plaintiff's debt from the plaintiff. *Id.,* 768 F.3d at 1114. Those calls formed the basis of the TCPA case. The court noted that whether prior express consent exists "turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly," and were able to conclude that in that case, because the husband expressly authorized his wife to provide his number on his behalf, and because the wife was informed that by providing the number, she agreed that the number could be released to other entities for payment issues, consent to call that number for debt collection existed. *Id.,* 768 F.3d at 1123-24. Thus, in *Mais,* the court based prior express consent to call the plaintiff regarding the plaintiff's debt on the fact that the plaintiff (1) authorized his wife to provide his cell phone number to the hospital; (2) agreed that the hospital could give the cell phone number to any entity for payment purposes; and (3) the calls at issue were attempts to collect the *plaintiff's* debt directly from the *plaintiff.*

Unlike in *Mais,* Rash Curtis does not submit any evidence showing that Plaintiff authorized his wife to provide his cellular telephone number to Rideout on his behalf, aside from the Verizon bill showing they both participate in a family cellular telephone plan. But that document is not authorization to provide consent to a third-party to call the 9189 Number. Second, unlike in *Mais,* where the relevant form advised that by providing a number, the entrant agreed that the hospital could release that number to other entities for payment purposes, there is no such language on the Facesheets. Indeed, the form makes clear that Plaintiff's contact information is provided with regard to his role as an "emergency contact" only. Third, every call that Rash Curtis placed to Plaintiff was regarding his wife's debt, not Plaintiff's debt, whereas in *Mais* every call to the plaintiff was an attempt to collect plaintiff's debt from the plaintiff. In short, *Mais* is inapplicable here, and Rash Curtis has otherwise failed to show that it had prior express consent to place automated debt collection calls to Plaintiff regarding his wife's debt by virtue of that that Plaintiff was listed as an emergency contact on the Facesheets.

## 2. Plaintiff did not provide prior express consent

Rash Curtis additionally argues that Plaintiff "directly" provided prior express consent to Rash Curtis during a July 18, 2014 conversation, in which he purportedly "affirmatively asked to be

14

called back at the 9189 number." (Doc. No. 12-1 at 3). But Rash Curtis does not submit a recording or transcript of this conversation. Nor does it submit a declaration from the Rash Curtis collector who spoke with Plaintiff, attesting to what was discussed. Instead, it relies on a declaration of its Executive Vice President, who has no first-hand knowledge of the conversation, but nonetheless claims that Plaintiff "called into Rash Curtis on July 18, 2014 from the 9189 number" and "requested a call back from Rash Curtis." (Keith Decl. ¶ 12). To the contrary, Plaintiff, who was a party to the conversation, declares that he "never asked Rash Curtis to call [him] at the 9189 Number." (McBride Decl. ¶ 5). Upon information and belief, Defendant "captured" Plaintiff's telephone number during an inbound call.

Further, Rash Curtis points to conversations Plaintiff had about his wife's bill, and notes that it did not call him until after those conversations. (Doc. No. 12-1 at 6). But given that Plaintiff is not obligated to pay his wife's debt (and Rash Curtis does not contend otherwise) and *Plaintiff* did not provide his number when the debt was incurred, the mere existence of such conversations do not provide Rash Curtis with prior express consent to place forty-five (45) subsequent debt collection calls to Plaintiff's cellular telephone. *See Nigro v. Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 806-07 (2d Cir. 2014) (plaintiff, who called power company regarding his mother-in-law's account, did not consent to subsequent debt collection calls because "[h]e did not provide his phone number during the transaction that resulted in the debt owed" and instead "provided his number long after the debt was incurred and was not in any way responsible for—or even fully aware of— the debt.").

### 3. The Patient Notes do not provide prior express consent

Finally, Defendant asserts without further elaboration that Marianne gave prior express consent via the "Patient Notes for Marianne McBride from Freemont-Rideout Heal Group" (the "Patient Notes"). (Doc. No. 12-1 at 3; Def. Exhibit 5). Robert Keith notes that the Patient Notes are "dated August 4, 2016" (Keith Decl. ¶ 8), yet the last call Rash Curtis placed to Plaintiff was on *February 18, 2016* (Keith Decl. ¶ 19), more than five (5) months before it received the Patient

Notes.[8] Rash Curtis fails to explain how it obtained prior express consent to call Plaintiff nearly half a year *after* it stopped calling Plaintiff.

Moreover, the only entry on the document listing the 9189 Number is dated November 15, 2015. (Def. Exhibit 5). By that point in time, Rash Curtis had already placed the vast majority of the calls to the 9189 Number (Collection Notes), and Plaintiff had already asked Rash Curtis on two separate occasions to stop calling him. (McBride Decl. ¶¶ 6-7).

Given that Rash Curtis did not possess the Patient Notes when it actually called the 9189 Number, and in any event, the 9189 Number does not appear on the Patient Notes until after the majority of calls were placed and after Plaintiff asked Rash Curtis to cease calling him, the Patient Notes did not provide Rash Curtis prior express consent to place debt collection calls to Plaintiff's cellular telephone.

### ii. *Even If It Existed, Consent Could Be Revoked*

Rash Curtis never had prior express consent to call Plaintiff's 9189 Number. However, even if it did, such consent was effectively revoked during Plaintiff's August 13, 2015 and October 19, 2015 requests to stop calling. (McBride Decl. ¶¶ 6-7). It was additionally revoked via Plaintiff's counsel's February 1, 2016 letter to Rash Curtis. (Kent Decl. ¶ 5 Kent. Decl. Exhibit D).

The Ninth Circuit has confirmed "that the TCPA permits consumers to revoke their prior express consent to be contacted by telephone autodialing systems." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017). Moreover, in *ACA Ant'l,* the D.C. Circuit affirmed the portion of 2015 FCC Ruling holding that "'a called party may revoke consent at any time and through any reasonable means'—orally or in writing—'that clearly expresses a desire not to receive further messages.'" *ACA Int'l*, 885 F.3d at 709 (quoting 2015 FCC Ruling at 7989-90 ¶ 47 & 7996 ¶ 63).

As noted, during the August 13, 2015 call, which is notated on the Collection Notes, Plaintiff asked Defendant to cease calling him. (McBride Decl. ¶ 6). The Collection Notes further indicate

---

[8] In addition, it received the Patient Notes more than six (6) months after Plaintiff's counsel's February 1, 2016 letter to Defendant directing it to cease calling Plaintiff's cellular telephone number. (Kent Decl. ¶¶ 5-7; Kent. Decl. Exhibit D, E & F).

16

that on October 19, 2015, Plaintiff advised Defendant that it was calling *his* cellular telephone and not his wife's. (Collection Notes at RASH CURTIS 00013 ("MR SD THIS IS HIS #")). During this call, Plaintiff reiterated his request for Defendant to cease calling him. (McBride Decl. ¶ 7). Nonetheless, Defendant continued to call Plaintiff after each of these requests to stop calling. (Collection Notes at RASH CURTIS 00012-13).

Further, on February 1, 2016, Plaintiff's counsel mailed a letter to Rash Curtis stating that she represents Plaintiff and directing Rash Curtis to "cease all calls to [the 9189 Number]." (Kent Decl. ¶ 5; Kent Decl. Exhibit D). The letter was received on February 5, 2016 and on February 9, 2016, counsel for Defendant confirmed receipt of the letter. (Kent Decl. ¶¶ 6-7; Kent Decl. Exhibits E & F).

Rash Curtis asserts that Plaintiff's requests did not occur because the Collection Notes do not explicitly reflect the cease requests. (Doc. No. 12-1). But Rash Curtis' Collection Notes are not a complete record of what transpired. Indeed, Rash Curtis consistently omits relevant information from its Collection Notes. In this case, it failed to note on its Collection Notes that it received counsel's letter asking it to cease calling Plaintiff's 9189 Number. (Collection Notes). As a result, it continued to call Plaintiff after receiving that letter. *Id.* Moreover, in *McMillion,* one of the named plaintiffs advised Rash Curtis that she "asked [Rash Curtis] nicely to stop calling," Rash Curtis's "representative replied that she didn't 'see where we've got down not to call you'" and the plaintiff "responded that she had 'been saying that for a long time'." *McMillion*, 2018 WL 692105, at *7. Rash Curtis's Collection Notes are simply not the entire story.

Rash Curtis also complains that "Plaintiff offers nothing more than a self-serving allegation that he told Rash Curtis to 'quit calling,' or the claim that Marianne could not be reached at 9189." (Doc. No. 12-1). In fact, Plaintiff submits (1) his declaration; (2) his counsel's declaration; (3) a copy of his counsel's cease and desist letter; and (4) Rash Curtis's counsel's confirmation of receipt of the same. If Rash Curtis wanted more testimony from the Plaintiff, Rash Curtis could have and should have served written discovery on Plaintiff and/or taken his deposition. Yet Rash Curtis did neither; only Plaintiff served discovery in this case.

Rash Curtis never had Plaintiff's prior express consent in this case. However, even if it did, there are at the very least triable issues of fact as to whether he revoked that consent. Thus, Defendant's Motion for Summary Judgment regarding prior express consent must be denied.

**D.  The Calls Placed after Revocation Constitute Knowing and Willful Violations of the TCPA**

The TCPA provides for the trebling of damages where the "defendant willfully, or knowingly violate[s]" the TCPA. 47 U.S.C. § 227(b)(3)(C).  Here, through Plaintiff's August 13, 2015 and October 19, 2015 conversations with Rash Curtis, (McBride Decl. ¶¶ 6-7), as well as Plaintiff's counsel's February 1, 2016 letter directing Rash Curtis to "cease all calls to [the 9189 Number]" (Kent Decl. ¶ 5; Kent Decl. <u>Exhibit D</u>), Plaintiff explicitly notified Defendant that it was violating the TCPA.  Moreover, the TCPA is "not unpredictable" and companies "are on clear notice that autodialing phones is prohibited by default." *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 727 (S.D.N.Y. 2015) (granting treble damages under the TCPA); *see Hernandez v. Rash Curtis & Associates,* No. 2:16-cv-02455-GHW (Nov. 16, 2017, E.D.C.A.) (ECF No. 35) (awarding treble damages to plaintiff arising out of Rash Curtis's repeated calls after receipt of letters revoking consent to be called).  Despite Plaintiff's requests and his counsel's letter, and Defendant's knowledge of the TCPA and that it lacked prior express consent, Defendant continued to place repeated automated calls to Plaintiff's cellular telephone.  (Collection Notes at RASH CURTIS 00012-13).  Taken together, Defendant's conduct exhibits a completely disregard of Plaintiff's rights, and establishes that it was fully aware that its actions violated the TCPA, but did not let that knowledge get in the way of its subsequent persistent calls to Plaintiff.  Accordingly, this Court should deny Defendant's Motion for Summary Judgment regarding whether its violations of the TCPA were knowing and willful.

**III.  DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE FDCPA CLAIMS**

The FDCPA prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of

a debt," which encompasses "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. § 1692d(5). "Whether there is actionable harassment or annoyance turns not only on the volume of calls made, but also on the pattern of calls." *Joseph v. J.J. Mac Intyre Companies, L.L.C.*, 238 F. Supp. 2d 1158, 1168 (N.D. Cal. 2002). "Numerous courts throughout the nation have held that the intent to annoy, abuse, or harass may be inferred from the nature, pattern, and frequency of debt collection calls." *Stirling v. Genpact Servs., LLC*, No. 2:11-CV-06369-JHN, 2012 WL 952310, at \*4 (C.D. Cal. Mar. 19, 2012).

The undisputed evidence shows that Defendant placed forty-five separate telephone calls to Plaintiff's cellular telephone. (Collection Notes; Keith Decl. ¶ 19). But, it is not just the excessive volume of calls that makes Defendant's calls harassing, it is the *pattern* in which it placed those calls. Specifically, it was Defendant's relentless telephone calls to Plaintiff, including *after* Plaintiff asked Rash Curtis to stop calling him, and *after* his counsel's cease and desist letter identifying both Plaintiff and his number. (Collection Notes; McBride Decl. ¶¶ 6-7; Kent Decl. ¶ 5; Kent Decl. Exhibit D). The volume and pattern of Defendant's calls, taken together, establish that Defendant's calls to Plaintiff violated 15 U.S.C. § 1692d(5). *See Crockett v. Rash Curtis & Assocs.*, 929 F. Supp. 2d 1030, 1033 (N.D. Cal. 2013) ("Rash Curtis's 22 calls to plaintiff raise a plausible inference of intent to harass in violation of Subsection 1692d(5)."); *Stirling*, 2012 WL 952310, at \*5 (characterizing "calling repeatedly after the consumer asked the debt collector to stop" as "a pattern of egregious conduct" sufficient to find liability under § 1692d(5)); *Sanchez v. Client Servs., Inc.*, 520 F. Supp. 2d 1149, 1161 (N.D. Cal. 2007) (granting summary judgment to plaintiff under § 1692d(5) where "the frequency and volume of the telephone calls show that defendants intended to annoy, abuse and harass plaintiff").

Moreover, the cases it relies on are easily distinguishable. In *Arteaga v. Asset Acceptance, LLC*, the plaintiff "present[ed] no evidence that [defendant] . . . called multiple times in a single day [or] . . . called after she requested [defendant] to cease calling." *Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1229 (E.D. Cal. 2010). By contrast, the undisputed evidence in this case

shows that (1) Defendant called Plaintiff more than once in a single day (Keith Decl. ¶ 20 (noting "Rash Curtis never placed more than two outbound calls to the 9189 number in a single day"); and (2) Defendant did call Plaintiff after he requested, on two separate occasions, along with his counsel's additional third request, for Defendant to cease calling him.

Nor does *Chavious v. CBE Grp., Inc.* support Defendant's position. In fact, it supports Plaintiff. There, the Court "recognize[d] that an inference of intent to annoy, abuse, or harass is much more readily drawn against a defendant who repeatedly calls someone after being asked to stop. Many Section 1692d(5) cases reflect this rationale." *Chavious v. CBE Grp., Inc.*, No. 10-CV-1293 JS ARL, 2012 WL 113509, at *3 (E.D.N.Y. Jan. 13, 2012). In that case, there was no allegation that the plaintiff asked the Defendant to stop, *see id.* at *1, but here the evidence shows Plaintiff *did* ask Defendant to stop, on three different occasions, yet the calls continued. Likewise, in the *Waite* case Rash Curtis cites, the court noted that "calling after being asked to stop is far more indicative of an intent to abuse" than merely a high volume of unanswered calls. *Waite v. Fin. Recovery Servs., Inc.*, No. 8:09-CV-02336, 2010 WL 5209350, at *4 n.8 (M.D. Fla. Dec. 16, 2010). Each of the other cases Defendant relies upon also lack any evidence that the plaintiff asked the defendant to stop calling. *See, e.g., Carman v. CBE Grp., Inc.*, 782 F. Supp. 2d 1223, 1232 (D. Kan. 2011) ("There is no evidence plaintiff ever disputed the debt or requested that the calls to her cease."); *Jiminez v. Accounts Receivable Mgmt., Inc.*, No. CV 09-9070-GWAJWX, 2010 WL 5829206, at *5 (C.D. Cal. Nov. 15, 2010) (same); *Tucker v. CBE Grp., Inc.*, 710 F. Supp. 2d 1301, 1305 (M.D. Fla. 2010) ("Plaintiff did not request that CBE cease calling."); *Jones v. Rash Curtis & Assocs.*, No. C 10-00225 JSW, 2011 WL 2050195, at *3 (N.D. Cal. Jan. 3, 2011) ("there is no genuine issue of fact that Plaintiff asked the collectors to stop calling, or asked them to refrain from calling at all or specifically at work, or complained about the number of calls received. Beside the frequency of the calls, there is nothing in the record to sustain a claim for intentional harassment."). And while the plaintiff in *Lynch v. Nelson Watson & Assocs., LLC*, "claim[ed] that she contacted [defendant] to direct them to stop calling," the Court found such claims unsupported by the record. *Lynch v. Nelson Watson & Assocs., LLC*, 2011 WL 2472588, at *1 (D. Kan. June 21, 2011)

("Plaintiff's phone records, however, reveal no instance in which Plaintiff ever called a phone number belonging to [defendant]").  Here, on the other hand, Plaintiff asked Defendant to stop calling repeatedly yet Defendant continued with its calls.

Defendant additionally argues that only calls within the one year preceding the filing of the Complaint should be considered for Plaintiff's FDCPA claim (those calls after October 6, 2015). (Doc. No. 12-1 at 16).  But even within that time period Plaintiff asked Rash Curtis to stop calling on October 19, 2015 (McBride Decl. ¶7) and Plaintiff's counsel asked again on February 1, 2016 via a letter that Rash Curtis acknowledges receiving (Kent Decl. ¶¶ 5-7; Kent Decl. Exhibits D, E & F), yet Rash Curtis continued to call Plaintiff after each request. (Collection Notes).  Thus, these is actionable harassment within the year preceding the filing of this case.

Given the evidence in the record showing that Rach Curtis consistently called Plaintiff regarding a third-party's debt, over his and his counsel's requests for Rash Curtis to stop calling, there are triable issues of fact regarding whether Defendant violated section 1692d of the FDCPA.

IV. **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING THE ROSENTHAL ACT CLAIMS**

### A. Plaintiff has Standing

Plaintiff has standing to pursue his Rosenthal Act claims.  Defendant argues that it was not attempting to collect a debt that arose out of a "consumer credit transaction" because Marianne McBride purportedly did not acquire services on credit, and therefore Plaintiff lacks standing. (Doc. No. 12-1 at 17).  Curiously, Rash Curtis also notes that it was attempting to collect her unpaid medical debts arising out of medical treatments, which she "simply failed to pay" despite agreeing to do so. *Id.*  Thus, according to Rash Curtis, Marianne acquired services without paying for them. That is precisely what constitutes a consumer credit transaction.

Indeed, Rash Curtis cites only to *Gouskos v. Aptos Vill. Garage, Inc.*, 94 Cal. App. 4th 754 (2001) in support of its argument that Plaintiff lacks standing, in which that court held that section 1788.2(e) "states that a consumer credit transaction means a transaction where a person *acquires* property or services *on credit.* In other words, there is a consumer credit transaction when the consumer acquires something without paying for it." *Id.,* 94 Cal. 4th at 759.  On the

facts at issue there, the *Gousko* court "venture[d] that in the automobile repair context there rarely would exist a consumer credit transaction because repair shops typically do not release repaired vehicles without payment; thus a vehicle owner would typically not acquire a shop's property or service until the property or service is paid for and he or she regains his or her own property." *Id.,* 94 Cal. App. 4th at 760. By contrast, here Defendant readily admits that third-party Marianne obtained medical services *without paying for them*. (Doc. No. 12-1 at 17). Thus, under *Gouskos,* the unpaid medical bills *are* consumer credit transactions. Rash Curtis's argument that Plaintiff lacks standing is meritless.

## B. Defendant Violated Cal. Civ. Code § 1788.11(d) and (e)

Cal. Civ. Code § 1788.11(d), much like 15 U.S.C. § 1692d(5), prohibits "[c]ausing a telephone to ring repeatedly or continuously to annoy the person called." For the same reasons set forth above showing that Defendant violated 15 U.S.C. § 1692d(5), Defendant also violated Cal. Civ. Code § 1788.11(d). *See Crockett*, 929 F. Supp. 2d at 1033 ("Claims under Section 1788.11(d) of the Rosenthal Act require the same proof of intent and are evaluated for specificity in the same way as claims under Subsection 1692d(5) of the FDCPA."). Similarly, Rash Curtis's repeated calls to Plaintiff over his and his counsel's explicit requests to stop calling constitute "[c]ommunicating, by telephone or in person, with the debtor with such frequency as to be unreasonable and to constitute an harassment to the debtor under the circumstances," in violation of Cal. Civ. Code § 1788.11(e).

## C. Defendant Violated Cal. Civ. Code § 1788.17

Defendant asserts it is entitled to summary judgment on Plaintiff's §1788.17 claim because, according to Defendant, it is also entitled summary judgment for Plaintiff's FDCPA claims. To the contrary, in light of Defendant's FDCPA violations, it also violated Cal. Civ. Code § 1788.17. *See Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1067 (9th Cir. 2011) ("the Rosenthal Act does not limit recovery simply because it is also available under federal law. The Rosenthal Act specifically provides that its remedies are intended to be 'cumulative and . . . in addition to any other . . . remedies under any other provision of law.'") (quoting Cal. Civ. Code § 1788.32).

22

# V. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT REGARDING ACTUAL DAMAGES

Defendant does not cite to any evidence in support of its request for summary judgment regarding Plaintiff's actual damages. (Doc. No. 12-1 at 18-19). Instead, it asserts in a conclusory sentence that "[b]ecause Plaintiff has failed to show any actual harm caused to him as a result of Rash Curtis' alleged conduct, Rash Curtis is entitled to partial summary judgment on this issue." (doc. No. 12-1 at 19). But it is *Rash Curtis* that moved for summary judgment. Thus, it is *Rash Curtis* that "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). Rash Curtis, who failed to conduct any discovery in this case, has likewise failed to satisfy its initial burden of supporting its request for summary judgment with evidence demonstrating there are no issues of material fact.

Further, Rash Curtis's arguments that "[t]he mere fact a debtor subjectively wishes he or she was not in debt collection, or the calls (during normal business hours) are inconvenient or embarrassing, does not, without more, create a violation," (Doc. No. 12-1 at 19) is completely irrelevant, because *Plaintiff is not a debtor* and *objectively* should not have been the subject of debt collection regarding someone else's debt. Rash Curtis fails to explain why a stranger should not be frustrated or annoyed or otherwise bothered by receiving calls regarding someone else's debt.

Accordingly, Rash Curtis is not entitled to summary judgment on this the issue of actual damages.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

DATED:  May 17, 2018                    TRINETTE G. KENT

                                        By: ___/s/__Trinette G. Kent___
                                        Trinette G. Kent, Esq.
                                        Lemberg Law, LLC
                                        Attorney for Plaintiff, John McBride

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 17, 2018, a true and correct copy of the foregoing was served electronically by the United States District Court for the Eastern District of California Electronic Document Filing System (ECF) and that the document is available on the ECF system.

*/s/ Trinette G. Kent*
Trinette G. Kent